UNITED STATES of America, Plaintiff,

v.

Robert CARROZZA, Vincent M. Ferrara, Dennis Lepore, Joseph Russo, and Carmen Tortora, Defendants.

Cr. No. 89-289-WF.

United States District Court, D. Massachusetts.

May 7, 1992.

Jeff Auerhahn, James Herbert and Gregg Sullivan, Asst. U.S. Attys., New England Organized Crime Strike Force, Dept. of Justice, Boston, MA, for plaintiff.

Oteri, Weinberg & Lawson, Martin G. Weinberg, Boston, MA, John F. Cicilline, Providence, RI, for defendant Raymond Patriarca.

Balliro, Mondano & Balliro, Joseph J. Balliro, Boston, MA, Henry D. Katz, Chelsea, MA, for defendant Robert Carrozza.

Elliot M. Weinstein, Boston, MA, for defendant Dennis Lepore.

Joseph Russo, pro se.

MEMORANDUM AND ORDER

WOLF, District Judge.

I. PROCEDURAL HISTORY

Defendants Robert Carrozza, Vincent Ferrara, Dennis Lepore, Joseph Russo and Carmen Tortora were in March, 1990, charged in a Superseding Indictment with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and with committing certain substantive crimes on behalf of the RICO

enterprise of which they were alleged to be a part.[1] More specifically, the defendants were charged with being members of a RICO enterprise known as the Patriarca Family of La Cosa Nostra (the "LCN" or the "Mafia"). Counts 1 and 2 of the Superseding Indictment charged each of the defendants with committing certain specified racketeering acts on behalf of the Patriarca Family. Counts 3 through 65 of the Superseding Indictment charged that many of those alleged racketeering acts also constituted crimes independent of RICO, including murder, extortion, distribution of narcotics, and obstruction of justice. However, the Superseding Indictment did not allege that all of the defendants participated in, or were criminally responsible for, each of the substantive crimes in Counts 3 through 65 allegedly committed on behalf of the Patriarca Family. Rather, each of the defendants was charged in Counts 3 through 65 with only those substantive crimes arising out of the racketeering acts in which he allegedly personally participated.

All five defendants were detained pending trial, some for more than two years. After taking testimony and receiving other evidence, the court in December, 1991 denied their motions to be released on Due Process and Sixth Amendment grounds. *See, United States v. Zannino,* 798 F.2d 544, 548–49 (1st Cir.1986); *United States v. Accetturo,* 783 F.2d 382, 388 (3rd Cir.1986).

As the foregoing suggests, this case involved intensive and lengthy pretrial proceedings. Many of the pretrial motions

raised novel issues of constitutional and statutory law. *See e.g., United States v. Ferrara,* 771 F.Supp. 1266 (D.Mass.1991) (involving constitutionality of statutory provisions under which government obtained warrant to intercept Mafia induction ceremony). It was estimated that the trial would take six months to a year. After the selection of a jury, which took nine days, all five of the defendants entered into binding plea agreements with the government pursuant to Fed.R.Crim.P. 11(e)(1)(C).

The plea agreements provided, among other things, that each defendant would: (1) remain silent with regard to the factual basis for his plea and, particularly, not say anything with regard to the existence of, or his membership in, the LCN;[2] (2) plead guilty to all, or virtually all, of the charges against him; (3) be required to serve a substantial term of incarceration; (4) be placed on Supervised Release for three to five years after serving his sentence; and (5) except for Tortora, forfeit a substantial sum of money. Some of the plea agreements provided for sentences constituting a downward departure from the otherwise applicable Sentencing Guidelines. Each plea agreement was contingent upon acceptance by the court of all four of the other agreements, reflecting the government's view that eliminating the need for any trial was a major purpose and benefit of each agreement.

After a hearing on April 29, 1992, the court determined that there were "justifiable reasons" for each of the agreed-upon downward departures, *see,* U.S.S.G.

---

1. Three of the defendants were originally indicted in November, 1989. When the Superseding Indictment was returned, the case also involved three additional co-defendants. One defendant, Raymond J. Patriarca, pled guilty earlier; one defendant was severed for a separate trial; one defendant is a fugitive.

2. In connection with their pleas of guilty each defendant acknowledged in court, pursuant to Fed.R.Crim.P. 11(c) and (d), that he understood his rights and was acting knowingly and voluntarily in pleading guilty. However, four of the defendants did not speak to the factual basis for the pleas pursuant to Fed.R.Crim.P. 11(f). Rather, the court relied exclusively on the information presented by the government in determining there was a proper factual basis for all

five pleas. *See* Fed.R.Crim.P. 11, Notes of Advisory Committee on Criminal Rules Concerning 1966 Amendment (with regard to factual basis, "the court should satisfy itself, by inquiry to the defendant *or* the attorney for the government *or* by examining the presentence report, or otherwise ...") (emphasis added); *McCarthy v. United States,* 394 U.S. 459, 467, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969); *Irizarry v. United States,* 508 F.2d 960, 966–68 (2nd Cir.1974); *United States v. Navedo,* 516 F.2d 293, 298 n. 10 (2nd Cir.1975); *United States v. Webb,* 433 F.2d 400, 403 (1st Cir.1970). By agreement with the government, Russo was allowed to make a brief statement which was not inconsistent with his pleas of guilty.

§ 6B1.2(c)(2), and that the degree of each departure was reasonable. Accordingly, the court accepted the plea agreements and imposed the required sentences. The court's reasons for accepting the plea agreements are explained below.

## II. ANALYSIS

### 1. *The Applicable Standards*

As indicated earlier, the government and the defendants agreed that a specific sentence was appropriate for each defendant. *See,* Fed.R.Crim.P. 11(e)(1)(C). Thus, the court was required either to accept each plea agreement and impose the sentence on which the parties had agreed or reject the plea agreements and afford the defendants an opportunity to withdraw their pleas of guilty. *See,* Fed.R.Crim.P. 11(e)(3) and (4); U.S.S.G. § 6B1.3. As also indicated earlier, by virtue of their terms, the rejection of one plea agreement would have operated to abrogate all of the others.

Prior to the introduction of Sentencing Guidelines, the rejection of a binding plea agreement required a "reasoned exercise of discretion in order to justify a departure from the course agreed upon by the prosecution and the defense." *United States v. Ammidown,* 497 F.2d 615, 622 (D.C.Cir. 1973); *see also, United States v. Noble,* 653 F.2d 34, 36 (1st Cir.1981) (involving a Fed.R.Crim.P. 11(e)(1)(A) charge bargain). Although the court's discretion concerning the acceptance of a plea agreement specifying a downward departure has been defined and limited by the Sentencing Guidelines, courts have encouraged the use of plea agreements providing for a specific sentence in appropriate cases, in part as a means of promoting certainty and fairness in the administration of the Sentencing Guidelines. *See, United States v. Wright,* 873 F.2d 437, 441 (1st Cir.1989); *United States v. Mak,* 926 F.2d 112, 113 (1st Cir. 1991); *United States v. Pimentel,* 932 F.2d 1029, 1033–34 (2d Cir.1991).

Under the Sentencing Guidelines, if the sentence specified in a binding plea agreement involves a downward departure, the court may accept it if it is satisfied that "the agreed sentence departs from the guidelines range for justifiable reasons." U.S.S.G. § 6B1.2(c). The Commentary to § 6B1.2 indicates that "justifiable reasons" are those described in 18 U.S.C. § 3553(b), which authorizes a departure where there exists "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from the described [in the Guidelines]." The Court of Appeals for the First Circuit has elaborated this standard by explaining that "a departure may be based upon circumstances which, though considered by the Sentencing Commission, [are] present 'to a degree' or weight 'neither readily envisioned nor frequently seen in connections with the offender and/or the offense of conviction'." *United States v. Citro,* 938 F.2d 1431, 1440 (1st Cir.1991) (quoting *United States v. Sklar,* 920 F.2d 107, 115 & n. 7 (1st Cir.1990)).

Generally, where circumstances justifying a departure exist, the court must also consider whether the degree of that departure is reasonable. *United States v. Diaz–Villafane,* 874 F.2d 43, 49 (1st Cir. 1989); *United States v. Aguilar–Pena,* 887 F.2d 347, 350 (1st Cir.1989).

In this case there are circumstances favoring departure which exist to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. In addition, the degree of the downward departure specified in each relevant plea agreement is reasonable.

### 2. *The Magnitude of the Departures*

The agreement that Dennis Lepore be sentenced to fourteen years (168 months) in prison does not involve a downward departure. The court assumed, however, that the remaining four agreements specified a sentence less than the otherwise applicable Sentencing Guidelines.

Joseph Russo is 60 years old. In addition to pleading guilty to all of the other charges against him, Russo tendered, and the court entered pursuant to the standards set forth in *North Carolina v. Al-*

*ford,* 400 U.S. 25, 31–3, 91 S.Ct. 160, 164–65, 27 L.Ed.2d 162 (1970), a judgment of guilty on the charge that Russo murdered Joseph Barboza, although he did not admit committing the crime. If Russo had been convicted of murdering Barboza, the Sentencing Guidelines would require that he be imprisoned for life. His plea agreement specified that he be sentenced to 16 years in prison.

Vincent Ferrara is 43 years old. He pled guilty to charges including the murder of James Limoli. If he had been convicted of the Limoli murder, he too would have been sentenced to life imprisonment pursuant to the Sentencing Guidelines. His plea agreement provided for a sentence of 22 years in prison.

Carmen Tortora is 44 years old and suffers from several serious medical problems. If he had been convicted of all of the charges against him, his prior record would have caused him to be sentenced as a Career Offender, *see,* U.S.S.G. § 4B1.1, and to serve more than 17 years in prison. Tortora previously served six years in prison for one of the three crimes constituting the pattern of racketeering included in the RICO charges against him in this case.[3] Tortora's plea agreement specified a 13 year prison sentence.

Finally, Robert Carrozza is 52 years old. He pled guilty to charges including extortion and drug trafficking. In the Presentence Report, the Probation Department calculated Carrozza's Sentencing Guidelines to be 151 to 188 months. The government, however, contended that the proper calculation of Carrozza's Sentencing Guidelines was 235 to 293 months. Carrozza's plea agreement specified a sentence of 228 months, or 19 years, in prison. The court analyzed his plea agreement on the assumption that the required sentence represented a seven month downward departure.

**3.** The court denied Tortora's motion to dismiss Counts 1 and 2 of the Superseding Indictment on Fifth Amendment grounds of Double Jeopardy. *See, Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). The court found that RICO, 18 U.S.C. § 1961 *et seq.* was intended to provide for punishment in addition to, as well as a substitute for, substantive RICO predicate offenses. *See, Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985);

### 3. *The Justifiable Reasons for the Departure*

█ There are circumstances in this case which, individually and cumulatively, justify departure. *See, United States v. Sklar,* 920 F.2d 107, 117 (1st Cir.1990) (the First Circuit does "not mean to imply that ... factors inadequate to warrant departure when taken in isolation may not in combination suffice to remove a case from the heartland"); *cf., United States v. Pozzy,* 902 F.2d 133, 138 (1st Cir.1990) (the First Circuit does not approve of "totality of the circumstances" approach to sentencing under the Guidelines). The primary justification for the departures is that by entering into his plea agreement, each defendant made an indispensable contribution to resolving all of the charges concerning all of the co-defendants then on trial with him. As a result, significant judicial resources may now be devoted to other important matters.

As the Court of Appeals for the Second Circuit has recognized, the Sentencing Guidelines do not address the value of the contribution made by a defendant whose plea of guilty also leads to the disposition of all charges against his co-defendants, resulting in the resolution of a substantial case "pending in the seriously overclogged dockets of the ... Courts of the United States." *United States v. Garcia,* 926 F.2d 125, 127–28 (2d Cir.1991); *see also, United States v. Agu,* 949 F.2d 63, 67 (2d Cir.1991) ("Cooperation with the judicial system can, in appropriate circumstances, warrant a departure"). The reasoning of the Court of Appeals for the Second Circuit was compelling in the circumstances of this case.

The United States District Court for the District of Massachusetts now has four

*United States v. Gambino,* 920 F.2d 1108 (2nd Cir.1990); *United States v. Pungitore,* 910 F.2d 1084 (3rd Cir.1990); *United States v. Gonzalez,* 921 F.2d 1530 (11th Cir.1991). Thus, the court concluded that a subsequent RICO prosecution is not barred by double jeopardy where, as here, the defendant's criminal conduct allegedly continued after the original prosecution. *Gambino, supra; Pungitore, supra; Gonzalez, supra.*

vacancies. In part as a result of this, and in part as a result of having devoted significant time to the pretrial proceedings in this case, this court now has responsibility for approximately 575 civil and 40 criminal cases. These figures are more than mere statistics. Many of these cases involve allegations of major criminal activity. Often, the defendants in these cases are detained pending trial. Many of the civil cases involve disputes concerning substantial sums of money and/or poignant human suffering, such as crippling physical injuries and enduring emotional distress. Each case demands and deserves the court's attention.

The Court of Appeals for the First Circuit also has an enormous volume of cases which are important to the litigants and to the public. *See, Federal Courts Study Committee, Report,* 109–11 (April 2, 1990) ("few deny that [the federal] appellate courts are in a 'crisis of volume' "); Levin H. Campbell, "Into the Third Century: Views of the Appellate System from the Federal Courts Study Committee," 74 *Mass.L.Rev.* · 292–98 (December 1989). Moreover, the work of the Court of Appeals has been significantly increased in recent years as a result of numerous appeals under the Sentencing Guidelines of previously unappealable sentences.

The plea agreements in this case eliminated the necessity of a trial expected to take six months to a year. They also eliminated the risk of a mistrial, which in this case was enhanced by the fact that Russo, who is not a lawyer, insisted on proceeding *pro se.*

Agreement to specific terms in prison also obviated the need for what could have been the complex and lengthy sentencing hearings following any conviction. As indicated by the now pending sentencing hearing of co-defendant Raymond J. Patriarca, who pled guilty earlier without any agreement with the government, deciding the extent to which a defendant in a RICO conspiracy should be held accountable for the conduct of his co-conspirators may be a challenging and time-consuming task. *See,* U.S.S.G. §§ 1B1.2(d) and 1B1.3(a)(1).

The pleas also eliminated the protracted appeals involving uncertain issues of law which would inevitably have followed any conviction. Inherent in such appeals is the possibility of the retrial of even lengthy organized crime cases. *See, United States v. Salerno,* 937 F.2d 797 (2nd Cir.1991) (Court of Appeals ordered retrial of 11 defendants allegedly associated with the Genovese Family of the LCN due to error committed by district judge during 13 ·month trial).

In addition, the plea agreements in this case did more than permit substantial judicial resources to be devoted to other important matters. They also allowed a similar redeployment of limited federal investigative and prosecutorial resources to combat the formidable criminal activity which continues in this community.

The extraordinary degree to which the five, linked plea agreements in this case contributed to freeing resources important to the administration of justice was alone sufficient to justify downward departures from the otherwise applicable Sentencing Guidelines. *Garcia,* 926 F.2d at 127–128; *Agu,* 949 F.2d at 67. There were, however, other unusual and important considerations which reinforced this conclusion.

The plea agreements in this case assured that dangerous defendants would be incarcerated, and not threaten society, for many years. This was not an inevitable result of these prosecutions at their inception, no matter how meritorious the charges. Inherent in our system of justice, with its presumption of innocence, its requirement that guilt be proven beyond a reasonable doubt, and its potential for jury nullification, is the risk that some who may be guilty will be acquitted. For example, in *Accetturo, supra,* 20 alleged members of the Lucchese Family of the LCN were tried for 21 months on RICO charges in New Jersey. All 20 defendants were acquitted by the jury, possibly in part because of the jury's displeasure with the government for subjecting it to a lengthy trial. *New York Times,* August 27, 1988, at p. 1.

Similarly, prosecutions of alleged members of the Mafia at times generate

charges of jury tampering. For example, in 1991, a jury returned verdicts of not guilty, after a six month trial, against five alleged members of the Gambino Family of the LCN in New York, including Peter Gotti. *New York Times,* October 20, 1991, at section 1, p. 28. Several individuals have now been charged with jury tampering in that case. *New York Times,* April 23, 1992, at section 3, p. 3. Indeed, charges of corruptly endeavoring to influence a juror have been proven in the District of Massachusetts in connection with trials of other members of the Patriarca Family of the LCN. *See, United States v. Bailey,* 834 F.2d 218, 220–21 (1st Cir.1987) (involving the 1986 trial of *United States v. Angiulo* ). The plea agreements in this case assured that these defendants would not, properly or corruptly, be acquitted and escape punishment. This serves the interests of justice.

In addition, the government argued that the many witnesses who feared for their safety if required to testify contributed to the justification for the agreed upon downward departures in this case. More specifically, the government contended that the plea agreements should be accepted because:

> The fact that the defendants pleaded guilty to all charges and agreed to serve a specific sentence that adequately reflects the seriousness of their crimes, precludes the expenditure of substantial resources and the risk to witnesses that would have resulted from a trial or sentencing hearing in this case. At trial or a sentencing hearing, the government would have called as witnesses numerous individuals who are or have been in the Witness Security Program of the U.S. Marshals Service. Producing such witnesses for trial, and arranging for their security while in this area, necessarily involve substantial expenditure of resources and risk to personal safety that are obviated by the defendants' agreement to serve the specific sentences agreed upon. Moreover, at trial or a sentencing hearing, the government would have called witnesses whose identity has not previously been revealed

publicly. The agreed upon sentences in this case obviate calling such witnesses to testify at a public trial or sentencing hearing.

*Government's Second Supplemental Sentencing Memorandum* at pp. 4–5. Although reluctant to suggest that defendants might be rewarded for intimidating witnesses, the court viewed the government's concern as a valid consideration militating in favor of a reasonable departure in the circumstances of this case.

Thus, the court concluded that in the unusual circumstances of this case, there were justifiable grounds for reasonable downward departures.

### 4. *The Departures Were Reasonable*

■ As indicated earlier, generally the degree of any justified downward departure must be reasonable. *Diaz–Villafane,* 874 F.2d at 49; *Aguilar–Pena,* 887 F.2d at 350. This court believes that, as in civil cases in which the court is called upon to approve a settlement, it is appropriate to consider the integrity of the process which produced the plea agreement in deciding the reasonableness of a departure. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982) (approving settlement of civil class action); *M. Berenson Co. v. Fanueil Hall Marketplace, Inc.,* 671 F.Supp. 819, 823 (D.Mass.1987) (same). In this case, the parties were represented by able, committed counsel. The plea negotiations were conducted arduously for more than a year, and with particular intensity over a long holiday weekend after the jury was selected. This process alone suggested the reasonableness of the sentences specified in the plea agreements.

This view was confirmed by careful scrutiny of the terms of those agreements. In assessing the reasonableness of imposing an agreed-upon downward departure, the court considered whether each specified sentence "adequately reflect[s] the seriousness of the offense behavior" and whether "accepting the agreement [would] ... undermine the statutory purposes of sentencing." U.S.S.G. § 6B1.2(a) (relating to ac-

cepting plea agreements which include the dismissal of charges).

Traditionally courts have considered four fundamental factors in deciding an appropriate sentence—incapacitation, rehabilitation, deterrence and retribution. *See generally*, A. Von Hirsch, *Doing Justice: The Choice of Punishments* (1976) (Report of the Study of Incarceration). The Sentencing Reform Act of 1984 (the "SRA"), 18 U.S.C. § 3551 *et seq.*, "rejects imprisonment as a means of promoting rehabilitation and states that punishment should serve retributive, educational, deterrent, and incapacitative goals, 18 U.S.C. § 3553(a)(2)." [4] *Mistretta v. United States*, 488 U.S. 361, 367, 109 S.Ct. 647, 652, 102 L.Ed.2d 714 (1989). Nevertheless, the SRA still requires the sentencing court to consider "the nature and circumstances of the offense *and* the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1) (emphasis added).

In deciding whether the agreed upon downward departures in this case were reasonable, the court gave paramount weight to the importance of incapacitating the defendants because they remain dangerous. As the government argued at sentencing, each of the defendants took a blood oath to the LCN as part of his initiation, swearing to commit crimes, including murder, on behalf of the Mafia if directed to do so. *See, United States v. DiGiacomo*, 746 F.Supp. 1176, 1184 (D.Mass.1990); *Ferrara*, 771 F.Supp. at 1270. The evidence and pleas demonstrated that each of the defendants acted on his oath and committed serious crimes in service of the Patriarca Family. In pleading guilty, the defendants neither acknowledged nor renounced their membership in the Mafia. *See,* footnote 2, *supra.* Thus, the court found that the defendants remain a threat to society. The court

agreed with the government, however, that in view of the ages of the defendants, the agreed upon sentences should reasonably assure that "these five men, who were once the leadership of the Patriarca Family in Eastern Massachusetts, will forever be removed as a factor in organized criminal activity in New England." Remarks of Assistant United States Attorney Jeffrey Auerhahn at April 29, 1992 Sentencing Hearing.

The court did not fully agree with the government, however, in its assessment of the defendants' character. The government contended at sentencing that the defendants had "no redeeming qualities." *Id.* Although it did not use the term at sentencing, the government at various times throughout the case suggested that the defendants were most aptly described by the nickname ascribed to Ferrara, who was in the Superseding Indictment alleged to be also known as the "Animal." In part to justify the recommended downward departures, counsel for several of the defendants ardently argued that their clients had "redeeming characteristics," including "love and affection for those close to them." Remarks of Oscar Goodman, Esq. at April 29, 1992 Sentencing Hearing.

In the course of prolonged and intensive pretrial proceedings, the court, among other things, sought to understand the defendants it was being called upon to judge. This task would, perhaps, have been easier if it were indeed appropriate to view the defendants simply as "animals." The court, however, was convinced that such a view of the defendants would be worse than incorrect. More importantly, it would trivialize the true threat that the defendants and others like them represent to society and, at the same time, demean the

---

4.  18 U.S.C. § 3553(a)(1) and (2) provides that: The court, in determining the particular sentence to be imposed, shall consider—
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

potential of the criminal justice system to deter unacceptable conduct, rather than only punish an inevitable succession of inhuman, incorrigible individuals.

More specifically, the court came to understand that the defendants in this case were not amoral or utterly unethical individuals. Rather, they have been faithful to an aberrant ethic that in some instances legitimizes violent and dangerous conduct—conduct which our society properly and severely condemns as criminal. In service of their ethic, however, the defendants at times exhibited qualities which in other contexts would be regarded as admirable, such as loyalty and courage.

In addition, the highly successful electronic surveillance in this case demonstrated that there co-exists in these defendants the capacity to commit violent crimes and, at the same time, sincerely reflect the most traditional concerns for the safety and well-being of their families. This was perhaps best demonstrated by Ferrara's advice to his now fugitive co-defendant "Sonny" Mercurio. Not knowing the government was intercepting their conversation as they split the proceeds of a $250,000 extortion, Ferrara urged Mercurio to use his share to buy his family a home in a community with "a good school system and no drugs." *See*, Transcript of Conversation Intercepted on January 15, 1987, in the Storeroom of Vanessa's Italian Food Shop, at 14–16.

The court believes that the danger to the community that the defendants represent is enhanced, rather than diminished, by the "normal" or even arguably admirable qualities they exhibited, in part because their human qualities suggest that there are many still among us who could behave as they did.[5] Yet, if recognized, these qualities also offer some hope that the future behavior of the defendants, and of others who might be influenced by their example, may be favorably affected by the operation of the criminal justice system in this case.

This court has long been skeptical of the capacity of prisons to rehabilitate defendants in the sense of reforming the character of adults whose values have not been properly shaped by family, schools, and religious institutions.[6] The elimination of rehabilitation as a factor to be considered in sentencing under the SRA seems to reflect a similar skepticism. *See*, 18 U.S.C. § 3553(a)(2); *Mistretta*, 488 U.S. at 367, 109 S.Ct. at 652.

Consistent with the SRA, however, this court believes that prison sentences have the potential to deter defendants from engaging in future criminal conduct and to discourage the commission of crimes by those who might learn from their experience. *See*, 18 U.S.C. § 3553(a)(2)(B). This potential exists precisely because the defendants, and others who might emulate them, have genuine human qualities.

5. Although the court certainly does *not* equate the defendants in this case with Nazi mass murderers, the effort of the government to depict them as without redeeming, human qualities and the court's response have parallels in the scholar Hannah Arendt's study of the trial of Adolf Eichmann. As Arendt noted, the judges in Jerusalem were:

> ... confronted with the task they could least escape, the task of understanding the criminal whom they had come to judge. Clearly, it was not enough that they did not follow the prosecution in its obviously mistaken description of the accused as a 'perverted sadist,' nor would it have been enough if they had gone one step further and shown the inconsistency of the case for the prosecution, in which [the prosecution] wanted to try the most abnormal monster the world had ever seen, and at the same time, try in him 'many like him,' even the 'whole Nazi movement and anti-Semitism

at large.' They knew, of course, that it would have been very comforting indeed to believe that Eichmann was a monster, even though if he had been Israel's case against him would have collapsed or, at the very least, lost all interest. Surely one can hardly call upon the whole world and gather correspondents from the four corners of the earth in order to display Bluebeard in the dock. *The trouble with Eichmann was precisely that so many were like him, and that the many were neither perverted nor sadistic, that they were, and still are, terribly and terrifyingly normal.*

H. Arendt, *Eichmann in Jerusalem: A Report on the Banality of Evil* (Penguin Books 1984) at p. 276 (emphasis added).

6. The court does believe, however, that prisons can make a meaningful contribution to rehabilitating defendants whose crimes are related to drug or alcohol addiction.

There were events in the course of this case which convinced the court that the defendants feel they are paying a substantial price for their misconduct. Carrozza and Russo are stepbrothers. The court believes it was painful for these proud and once powerful men to have to ask permission to visit their dying mother and to be required to make that limited visit accompanied by United States Marshals.

Similarly, the court believes that many of the defendants truly love their children. Indeed, sparing those children the daily publicity a lengthy trial would generate motivated Ferrara particularly to make a determined effort to reach a plea agreement acceptable to the government. The court fully expects that it will be disturbing and difficult for these men to be separated from their families for the next 13 to 22 years.

During that period, the defendants will have an opportunity to ponder the choices which may exist when, if they live long enough, they are released. Ferrara's counsel argued at sentencing that his client "does have those redeeming values of love and affection for those who are close to him and someday [he] will return to those people in a way that life will be meaningful." Remarks of Oscar Goodman, Esq. at April 29, 1992 Sentencing Hearing. Similar claims might have been made for almost all of the defendants. Ferrara and his colleagues will now have many years to consider whether they will when released prove counsel's predictions concerning the

tranquil nature of their last years to be prophetic.

At the same time, these defendants, and other present or potential members of the LCN, will now have the opportunity to consider what will almost certainly occur if the defendants ever resume their criminal conduct. This case represents the culmination of a decade of successful prosecutions of the leadership of the LCN in New England. *See e.g., United States v. Angiulo,* 897 F.2d 1169 (1st Cir.1990); *United States v. Zannino,* 895 F.2d 1 (1st Cir.1990); *United States v. Angiulo,* 847 F.2d 956 (1st Cir. 1988); *United States v. Cintolo,* 818 F.2d 980 (1st Cir.1987); *United States v. DiGiacomo, supra.* These cases have involved impressive feats by the Federal Bureau of Investigation, including the bugging of the Patriarca Family headquarters in Boston, *Angiulo,* 847 F.2d at 976; the undercover infiltration of one of the regimes of the Patriarca Family, *DiGiacomo,* 746 F.Supp. at 1184; and the interception of the LCN's most sacred, secret induction ceremony, *Ferrara,* 771 F.Supp. at 1270. When released, the defendants will be on supervised release for up to five years. Should any defendant commit another crime, or indeed associate with his co-defendants or any other felon, it is virtually certain that he will be caught and again sentenced to prison.[7]

In view of the foregoing, the court found that the sentences specified in the plea agreements were sufficient to send the

---

7. For example, there is information suggesting that Vincent Marino participated in the shooting of Frank Salemme on behalf of some of the defendants in this case. *See, United States v. Patriarca,* 776 F.Supp. 593, 602 (D.Mass.1991); *Ferrara,* 771 F.Supp. at 1275. On the evening of the Salemme shooting, Marino was arrested and subsequently charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Following Marino's plea of guilty in June, 1990, this court imposed a Guideline sentence of 30 months in prison to be followed by five years supervised release. The court warned Marino at sentencing that if he committed a crime while on supervised release, he would likely be caught and again incarcerated.

Marino was released from prison on or about December 30, 1991. In February, 1992, *The*

*Boston Herald* reported he had been accused in state court of another shooting. This court promptly had Marino taken into custody and held a four day evidentiary hearing to determine whether Marino's supervised release should be revoked.

On February 21, 1992, this court found that Marino had violated the conditions of his supervised release by committing the crimes of possessing a firearm, assault and battery with a dangerous weapon, and conspiring to distribute cocaine, as well as by associating with a known felon without the permission of the Probation Office. The court then revoked Marino's supervised release and imposed the maximum permissible sentence, two additional years in prison. Marino is now serving that sentence.

message that if the defendants, or others similarly situated, seek to serve the Mafia they will be pursued, prosecuted, and seriously punished. Thus, the court concluded that those sentences amply addressed the goals of specific and general deterrence.

Finally, the court considered whether the agreed upon sentences sufficiently served the goal of retribution. This concept is characterized by the SRA as "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In essence, the concept of retribution recognizes that a sentence is important in part as an expression of society's commitment to the values embodied in law and its condemnation of those who reject of those values. As was rightly said more than a century ago, even "if murder could be prevented by the fine of one shilling, we could not without doing violence to the moral bonds of society settle for a one shilling fine for murderers." J. Wilson, *Thinking About Crime* 179 (1974) (quoting J. Stephen, *A History of the Criminal Law in England* 79 (1883)). The court was persuaded that in the context of these defendants, the agreed upon sentences of 13 to 22 years, which the defendants will have to serve without the prospect of parole, reasonably recognized the severity of the offenses and punished the defendants properly for their crimes.

Accordingly, the court concluded that the downward departures required by the plea agreements would satisfactorily serve the statutory purposes of sentencing.

## III. CONCLUSION

As the court found the agreed upon downward departures to be justified and reasonable, the court accepted the five plea agreements in this case and imposed the specified sentences, namely:

1. Vincent Ferrara—22 years in prison, to be followed by five years supervised release, and forfeiture of $1,116,200;

2. Robert F. Carrozza—19 years in prison, to be followed by five years supervised release, and forfeiture of $878,000;

3. Joseph A. Russo—16 years in prison, to be followed by five years supervised release, and forfeiture of $758,200;

4. Dennis Lepore—16 years in prison, to be followed by five years supervised release, and forfeiture of $766,700; and

5. Carmen A. Tortora—13 years in prison, to be followed by three years supervised release, and forfeiture of $2,000.