UNITED STATES of America

v.

**Gennaro J. ANGIULO, Donato F. Angiulo, Francesco F. Angiulo and Ilario M.A. Zannino.**

**Crim. No. 83–235–WGY.**

United States District Court, D. Massachusetts.

April 25, 1994.

---

Joseph Balliro, Balliro, Modano, & Balliro, Boston, MA.

Paul Smith, Nahant, MA.

Robert Shehetoff, Shehetoff & Homan, Boston, MA.

Henry Katz, Chelsea, MA.

Eliot Weinstein, Boston, MA.

Anthony Cardinale, Boston, MA.

Ernie DiNisco, Asst. U.S. Atty., U.S. Attys. Office, Boston, MA.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

In 1986, after one of the longest criminal trials on record, three organized crime figures, Mafia members Gennaro J. Angiulo, Donato F. Angiulo, and Francesco F. Angiulo were convicted, *inter alia,* of racketeering and racketeering conspiracy.[1] After an exhaustive and meticulously careful sentencing proceeding, one of my most distinguished colleagues, The Honorable David S. Nelson, sentenced Gennaro Angiulo to an aggregate of forty-five years in prison, Donato Angiulo to twenty years in prison, and Francesco Angiulo to twenty-five years in prison. Another defendant in the same indictment, Ilario M.A. Zannino ("Zannino") was tried separately due to the precarious state of his health and, in 1987, was convicted of loan sharking and gambling offenses. After equally careful consideration, Judge Nelson sentenced him to thirty years in prison. The First Circuit has upheld these convictions. *United States v. Angiulo,* 897 F.2d 1169 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Zannino,* 895 F.2d 1 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

Each of the defendants has remained in custody since his conviction. Pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure as then in effect, each defendant duly moved for a reduction of sentence in 1990. The government opposed the motions of Gennaro Angiulo, Donato Angiulo and Francesco Angiulo in 1991, and the motion of Ilario Zannino in March, 1992. By the time the detailed submissions related to these individual motions had been amassed, however, Judge Nelson had taken senior status and was unavailable to hear the issues presented.

The pending motions having been redrawn to this Court, I determined that an oral hearing was in order as I had not been the

1. Among the predicate acts supporting the racketeering conviction of Gennaro Angiulo was a conspiracy to murder one Angelo Patrizzi.

judge presiding over the actual trial and was, of necessity, dealing with a cold record. The order for such hearing issued on April 14, 1992, and the hearing was duly held on May 14, 1992. The final post-hearing submission was filed on May 24, 1993. The Court has taken the time to read and review each of the various submissions, together with so much of the trial record as has been laid before it and all related decisions in both the federal and state courts in order to render a fully informed and reflective decision.

While the Court has carefully considered the situation of each individual defendant separately, its analysis proceeds at a level of generality such that each point applies to all the defendants equally with but two qualifications. These are as follows:

Gennaro Angiulo treated the oral hearing as an outing from prison, an opportunity to meet and greet supporters. Choosing to represent himself, his argument consisted of nothing but puerile ranting against a decision of the First Circuit Court of Appeals. Were this all the record before the Court on his behalf, I would have little hesitancy about dismissing it out of hand and denying his motion peremptorily as unworthy of analysis.

But there is more. On June 22, 1992, Gennaro Angiulo submitted on his own behalf a thoughtful, well-reasoned brief that appears to demonstrate the mediating and guiding hand of skilled counsel. In fairness to Gennaro Angiulo, therefore, the Court will analyze his motion based on this brief.

Second, the Court proceeds in full recognition of the most precarious state of Mr. Zannino's health. The Court accepts as factually accurate each of the references to his present state of health set forth in his brief and proffered at oral argument. It is fair to say that Mr. Zannino is a sick man with but a limited life expectancy.

Having made these individual observations, the Court turns to the relevant general considerations.

**This Court's role.**

[T]he underlying objective of Rule 35, ... is to "give every convicted defendant a second round before the sentencing judge, and [afford] the judge an opportunity to reconsider the sentence in light of any further information about the defendant or the case which may have been presented to him in the interim." *United States v. Ellenbogan* [Ellenbogen], 390 F.2d 537, 543 (2d Cir.1968).

Fed.R.Crim.P. 35(b) advisory committee's notes (as amended through 1983).[2]

Of course, I am not the sentencing judge. I did not preside over this complex and lengthy trial. Nonetheless, the trial judge is presently unavailable and the defendants, as is their right, have each made a motion then permitted by the Federal Rules of Criminal Procedure. It thus falls to this Court to rule upon these motions.

■ As a threshold matter, what weight ought I give to the careful and considered judgment of Judge Nelson? No one here argues that his sentences are "law of the case." *See United States v. Rosnow*, 9 F.3d 728, 730 (8th Cir.1993). Indeed, this is self evident since the very existence of the 1983 version of Rule 35(b) posits a "second round" before the sentencing judge.

Instead, the government argues that the appropriate standard ought be one of "great deference," given the masterful job by Judge Nelson in presiding over the actual case and recognizing his great familiarity with the impact of the live witnesses and the conduct— including the improper outbursts—of certain of the defendants. Alternatively, defense counsel argue that I ought adopt something akin to the "substituted judgment" standard, *see Rogers v. Okin*, 738 F.2d 1, 6–7 (1st Cir.1984), and do what Judge Nelson would do in the circumstances. This, they assure me, would result in a substantial reduction of the sentences of the defendants in view of what they posit was Judge Nelson's misapprehension of the defendants' parole eligibility and his general track record of solicitude

2. This reflective "second round" has since vanished from Rule 35(b), its demise occasioned by the passage of the Sentencing Reform Act of 1984 with its concomitant assumption that more attention would be paid to the initial imposition of sentence. *See* Fed.R.Crim.P. 35(b) advisory committee's notes (as amended through 1991).

for, and careful review of, the status of those he incarcerated.

This Court rejects both approaches. Rather, to give full effect to the language of the then-applicable Rule 35(b), this Court rules that the defendants are entitled to a genuine "second round" here. Thus, I have read and reread so much of the primary materials—transcripts, court records, medical records, and the like—as have been made available to me, but I *also* have read with care each of the secondary materials—such as opinions, memoranda, trial rulings, and orders of the trial judge as well as the appellate decisions of both federal and state courts concerning this case and these defendants—and have used them as a gloss on the cold trial record to arrive at what, in my judgment, are appropriate sentences in the circumstances. Let me be clear: in the unique circumstances of this case, it seems to me I must bear the responsibility for the sentences ultimately to be served. That is why I have taken the time and care to peruse the record at length. While my reading of the opinions of other judges is, of course, deferential to the immediacy of their judicial involvement with this case, the ultimate judgment on these motions is my own. I have not tried to see the case through Judge Nelson's eyes.[3]

**If this Court is itself to take responsibility for these sentences, what principles guide the decision?**

For any trial judge with the responsibility to exercise the criminal jurisdiction of a court, the duty to consider the appropriate penal sentence that may be passed upon another human being is an ever-present reality.[4] Through the imposition of a penal sentence, a judge expresses the considered and reflective views of the society of which the judicial system is a part. Through the sentence of the court, the judge is teaching the law in one of its most practical, immediate, and individualized expressions. This is the very essence of the judicial role.

What then does a judge actually do? In short, he or she explains the law and, in so doing, declares publicly held values. This is the essence of the judicial role. It is, perhaps, more easily understood at the appellate level where carefully written opinions, collegially arrived at, address the nuances of law as we understand it, explaining and giving guidance for the future. Far more common, although perhaps not appreciated as such,[5] is the teaching done on a daily basis by the judges of our various trial courts. When these judges instruct juries or write opinions in jury waived cases they are, quite simply and directly, teaching how the generalized sweep of the law applies in particular cases. Less obvious, but equally instructive is the teaching done by our judges every time an individualized penal sentence is handed down or an evidentiary ruling is made. In these things, too, the judge is acting as a teacher, explaining through his or her very demeanor and conduct of the judicial proceeding precisely how the law works its way out in individual cases. The trial judge thus is seen as more than a mere conduit of the generalized standards to the litigants involved in a particular case. Every legal decision depends upon a melding of the generalized standard with the particular facts at hand. It is the judge who teaches how the meld-

---

3. This approach obviates the need to evaluate the arguments of the defendants dependant on the "substituted judgment" approach. In any event, there is utterly no foundation that I can see for the view that Judge Nelson was somehow mistaken in the effect of his sentencing decisions. Indeed, I have never seen a more meticulous sentencing record than that prepared in this case.

Moreover, while I know of no judge more solicitous of and concerned for defendants whom he has committed to incarceration than Judge Nelson, I simply cannot, and would not in any event, involve myself in predicting what he would do if required to adjudicate this particular

motion. That responsibility has fallen to me, and I must discharge it.

4. Robert Satter, Doing Justice: A Trial Judge at Work 17–19, 170–85 (1990).

5. As Professor Chayes points out, until recently "the spotlight of teaching, writing, and analysis was almost exclusively on appellate decisions. In practice, the circle was even more narrowly confined to the United States Supreme Court, the English high courts ..., and a few 'influential' federal and state appellate judges." Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. 1281, 1285–86 (1976).

ing is to take place in each individualized instance. The judicial role is thus defined as that of a teacher, declaring in an institutional setting our publicly held values.

William G. Young, John R. Pollets & Christopher Poreda, *1993 Supplement to Kenneth B. Hughes, Evidence* at 6 (Massachusetts Practice Series Volume 19).

While this teaching is in no sense vindictive and while the judge ought necessarily consider the views of the victims and those most directly affected by the crime, the defendant and his family and friends, and the executive agencies charged with the enforcement of the law and the implementation of the values expressed therein, the judge is bound only by the constraints of the sentencing framework as enacted by Congress. Within this general framework a penal sentence draws its expressive life and its particularized value in teaching the law from the mores and values of our society as a heterogeneous whole. In a very real sense, a judge imposing a penal sentence is giving practical effect to our most communitarian efforts—a process that necessarily involves all three branches of government, the legislature establishing the sentencing framework, the executive formally expressing society's values in its enforcement efforts, and the judiciary melding these together with a particularized concern for the human costs to every individual affected.

■ In attempting to discharge the duties just limned, like many judges I try to take into account four basic criteria: condign punishment or retribution, specific deterrence, general deterrence, and rehabilitation. While every case necessitates an evaluation of all four principles, I am quick to concede that my judicial experience leads me to the view that rehabilitation is rarely, if ever, furthered by prison.[6] Generally, a prison sentence serves nothing more than the first three principles just mentioned. These are matters I have considered over seventeen years of judicial service, first expressing my views thereon in a written opinion in *Com-*

*monwealth v. Silvia,* Crim. Nos. 12265–12268 (Bristol Super.Ct. March 26, 1984) (Sentencing Memorandum), *affirmed sub nom. Commonwealth v. Cordeiro,* 401 Mass. 843, 519 N.E.2d 1328 (1988). There the Court quoted columnist George F. Will to the effect that:

[W]e should do what we know how to do, for reasons we can explicate. We should use the criminal justice system to isolate and punish—that is, to protect society from physical danger—and to strengthen society by administering condign punishments that express and nourish, through controlled indignation, the vigor of our values. We should be ashamed and alarmed to live in a society that does not intelligently express through its institutions the public's proper sense of proportionate punishment. . . .

George F. Will, *The Value of Punishment,* Newsweek, May 24, 1982, at 92. I continue to adhere to the views there expressed. Mindful of both this general and specific analytic framework, the Court examines the particular arguments advanced here.

**Rehabilitation, remorse, and specific deterrence.**

No one even bothers to argue that these lengthy prison sentences have rehabilitated any of these defendants. True, each one has apparently served his sentence without disciplinary infractions. Indeed, Zannino has been frequently hospitalized. Still, there is here no evidence whatsoever that incarceration has caused any of these defendants to turn their lives around or to abandon their obdurate adherence to their criminal enterprise.

Likewise, while token, obligatory expressions of remorse are voiced by Gennaro Angiulo and defense counsel. They are utterly unconvincing and play no role in the Court's determination.

More serious is the argument that, given the age and physical infirmity of these defendants, they no longer pose a threat to society. The Court rejects this argument as to

---

6. Indeed, where a prison term has played a rehabilitative role, it has usually been in those instances where a short term of "shock incarceration" has been imposed or where the prison provided substance abuse treatment facilities coupled with a coercive framework that inclined the defendant to make use of them. In sum, prison does not rehabilitate.

Gennaro Angiulo (who does not seriously press it in any event). The Court is unpersuaded that Donato and Francesco Angiulo pose no continued threat, but is persuaded that, given the physical ailments of Ilario Zannino, his continued confinement no longer serves the end of specific deterrence.

## The Sentencing Guidelines..

■ All parties attempt to conjure with the subsequently enacted Sentencing Guidelines. The defendants argue that the Sentencing Guidelines express the Congressional mandate concerning the severity of the sentence to be imposed upon them and submit that, had the guidelines been in place, their sentences would have been much less than those actually imposed by Judge Nelson. They make particular reference to the sentences imposed in *United States v. Patriarca,* 807 F.Supp. 165 (D.Mass.1992), *vacated sub nom. United States v. Carrozza,* 4 F.3d 70 (1st Cir.1993) (97 months), and *United States v. Ferrara,* 807 F.Supp. 156 (D.Mass.1992), *affirmed,* 4 F.3d 70 (1st Cir.1993) (22 years), which, they argue, reveal the proper guideline sentences for similarly-situated—Donato and Francesco argue that they were actually much lower-echelon—mafioso. Not surprisingly, the government disagrees, adverting to a variety of add-ons and upward departures which, they say, would have resulted in a life sentence for Gennaro Angiulo and sentences comparable to those imposed by Judge Nelson for the others.

Nothing is to be gained by entering this "morass." [7] As this Court regretfully has had occasion to remark before, *see United States v. Osseiran,* 798 F.Supp. 861, 869–70, 870 n. 9 (D.Mass.1992), *affirmed sub nom. United States v. Fisher,* 3 F.3d 456 (1st Cir.1993) (detailing the government's charge bargaining shenanigans and observing that the federal sentencing guidelines do not eliminate discretion, but merely shift it from the judge to the prosecutor); [8] Transcript of Sentencing Hearing at 57–63, *United States v. Smith,* Crim. No. 92–10272–Y (D.Mass. Feb. 16, 1994); [9] Transcript of Hearing Concerning Sentencing at 47–48, *United States v. Vassapole,* Crim. No. 93–10144 (D.Mass. Mar. 30, 1994),[10] as a principled standard for

7. So J.W. Carney, Jr., Esq., a distinguished member of the Massachusetts bar, referred to the United States Sentencing Guidelines in his lecture on recent developments in criminal law at the annual meeting of the Massachusetts Bar Association, January 14, 1994. *See United States v. Harrington,* 947 F.2d 956, 964 (D.C.Cir.1991) (Edwards, J., concurring) (calling the Guidelines a "farce").

8. *Accord* Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines,* 28 Wake Forest L.Rev. 223, 287 (1993) ("Stith & Koh") ("unwarranted sentencing disparity is as great now as it was before the Federal Sentencing Guidelines, though perhaps more hidden from view") (citing Judy Clarke, *The Sentencing Guidelines: What a Mess,* Fed. Probation, Dec. 1991, at 45; Gerald W. Heaney, *The Reality of Guidelines Sentencing: No End to Disparity,* 28 Am.Crim.L.Rev. 161, 164–65 (1991); *The Sentencing Guidelines and Its Critics,* 2 Fed.Sentencing Rep. 224, 226 (1990) (statement of Thomas W. Hillier II, Federal Public Defender)).

9. This Court there endorsed the thoughtful remarks of The Honorable Jose Cabranes that: [T]he fundamental problem with the guidelines is not their attempt to guide judicial discretion *or* their severity, but their utopian premise that "unwarranted disparity" can and should be eliminated by rigid, detailed, mandatory sentencing formulas. Judges, prosecutors, defense attorneys and probation officers (the last charged with advising the judge of sentencing calculations under the guidelines) are being forced to operate under a byzantine system of rules devised by an administrative agency in Washington—rules that generally ignore individual characteristics of defendants and sacrifice comprehensibility and common sense on the altar of pseudoscientific uniformity.

Governed by 700 pages of labyrinthine guidelines, the sentencing hearing today can be nearly unintelligible to victims, defendants and observers, not to mention the lawyers and judges involved. Disparity is rife, though much of it is now hidden within the guidelines themselves and in the silent exercise of discretion by police officers and federal agents, prosecutors, probation officers and (even now) judges.

Too often, when it is all over, neither the judge nor the lawyers are able to explain (never mind justify or defend) the sentence imposed. Surely at this point in history we should have few illusions about the effectiveness of bureaucracies in projecting and achieving egalitarian social goals.

Jose A. Cabranes, *Incoherent Sentencing Guidelines,* Wall St.J., Aug. 28, 1992, at A11 (letter to the editor).

10. Noting that the failure of the Sentencing Guidelines to provide certainty in sentencing has given rise to the proliferation of mandatory mini-

evenhanded, understandable, and consistent sentencing, the Sentencing Guidelines are a complete failure. Neither I nor any other judge of my acquaintance would knowingly enter their labyrinthine maze unless compelled to do so by the direct statutory mandate of Congress.[11] That mandate is lacking here, and there is no occasion to consider the Sentencing Guidelines further.

**These are life sentences.**

■ The defendants argue persuasively that, given their present ages (Gennaro Angiulo is 75; Donato Angiulo is 71; Francesco Angiulo is 73; Ilario Zannino is 73) and the length of time yet to serve on these severe sentences, they are, for all practical purposes, life sentences without hope of parole.[12] The government sidesteps this issue,[13] arguing lamely that, as these are pre-guidelines sentences, the defendants will, relatively soon, become eligible for parole and, in any event, should their health fail and the end draw near, they will become eligible for compassionate release. Mere eligibility for parole, however, is not an issue central to sentencing. As defense counsel and the brief of Gennaro Angiulo argue persuasively, these Mafia figures have but a remote chance of being paroled. The overwhelming likelihood is that these defendants will either "max out" their sentences or die in prison. The Court accepts this stark fact and proceeds in full consciousness of it.

Molly Fairchild James, in her article *The Sentencing of Elderly Criminals*, 29 Am. Crim.L.Rev. 1025 (1992), provides the most comprehensive recent treatment of the issues inherent in the fact that "[a] sentence that could be completely served by a younger person, and that would provide such a person

---

mum sentences. Interestingly, since the executive can waive the application of the mandatory minima laws, today only 74.3% of the defendants who ought receive mandatory minimum sentences actually are charged under the highest mandatory minimum provisions at the indictment stage, U.S. Sentencing Comm'n, Mandatory Minimum Penalties in the Federal Criminal Justice System 57 (Comm'n Print Aug. 1991), and these are frequently the least culpable. Since no sentencing certainty is to be found in mandatory minimum sentencing either, we careen on to "three strikes and you're out" and an expanded list of crimes carrying the death penalty. Where will it end?

One courageous decision in this Circuit points the way. In *United States v. Rivera*, 994 F.2d 942 (1st Cir.1993) (Breyer, C.J.), the court explains that the Sentencing Guidelines are just that, guidelines, that only a few criteria are off-limits as grounds for departure, that other criteria give rise to encouraged departures, and still others permit departures.

While *Rivera* may give rise to a workable system and an expanded common law of sentencing, the goal will be achieved only at enormous cost. How much better, therefore, were Congress to permit adoption of a simple computer model of the sentences actually being imposed today, update it constantly, and tell the judges who sentence above or below the average for that crime (say by 10% or 25%, as Congress decides) that they must explain the grounds of the sentence with plenary review vested in the Courts of Appeals. Such a guidelines system, in addition to the commendable virtues of simplicity, general comprehensibility, and prompt imposition of sentence, would truly restore certainty to sentencing within the framework of a genuine common law of sentencing.

11. "Very few judges other than those who have served on the [Sentencing] Commission have uttered positive assessments of the new system's effects on both criminal sentences and the process of sentencing. Within the federal judiciary, criticism has come from Republicans and Democrats, liberals and conservatives." Stith & Koh, *supra* note 8, at 281–82.

12. In Gennaro Angiulo's original motion for reduction of sentence, he advanced the notion that he ought be paroled from his federal sentence to commence serving a life term in the Commonwealth of Massachusetts upon his conviction as an accessory before the fact to the crime of murder in the first degree of Angelo Patrizzi. For the proceedings leading up to his trial in Massachusetts on this charge, see *Angiulo v. Commonwealth*, 401 Mass. 71, 514 N.E.2d 669 (1987). Significantly, Gennaro Angiulo's conviction on this charge was reversed in *Commonwealth v. Angiulo*, 415 Mass. 502, 615 N.E.2d 155 (1993), but the Commonwealth appears not to have commenced proceedings to re-try him on this charge. Apparently, it is the view of the appropriate Commonwealth officials that the matter does not warrant further expenditure of prosecutorial resources in view of his lengthy federal prison sentence.

13. And no wonder. It is all very well to argue generally "lock 'em up and throw away the key." It is quite another thing to sentence an individual human being to spend the rest of his life behind bars. Only judges who have been required to discharge this responsibility can speak to its effect on the human spirit. Presiding over a death penalty case is doubtless far more of an ordeal. I do not know.

to have some life left outside of prison, may be a life sentence for an elderly criminal." *Id.* at 1040.

Ms. James comprehensively analyzes the various approaches to sentencing older criminals, focusing especially on the utilitarian and retributivist theories of sentencing. As to the utilitarian theory, she concludes:

Under the utilitarian theory, punishment is a necessary evil which is socially useful to reform offenders, protect society and deter the convicted individual and others in society from committing illegal acts. The proper amount of punishment is that which will do the most good or the least harm to all who are affected by it.... Under this approach, elderly offenders may have sentences reduced if their age renders them less dangerous to society. However, they may not enjoy reduced sentences if they are considered beyond rehabilitation because of lengthy criminal records. Because utilitarian theory includes the concept of deterrence, it does not lend itself to letting older people off without any punishment at all.

. . . .

From a utilitarian perspective, reduced sentences for the elderly make sense if deterrence and rehabilitation are ineffective for that population. Because punishment is not seen as an end in itself, severe punishment should not be implemented if it serves no societal purpose. If an elderly individual is not presently a threat to society, or soon will cease to be a threat because of advancing age, it would be better to release these relatively harmless individuals into society than to keep them in prison and have taxpayers incur $60,000 a year in their support.

. . . .

... Working on the assumption that the elderly are not inherently feeble or simple-minded, the utilitarian theorist would accept [an age-neutral] scheme [of sentencing] as necessary to deter and rehabilitate the criminal, as well as to protect society from dangerous characters. However, if there comes a time when an elderly prisoner is frail or feeble and no longer a danger to others, he or she should be released or

punished less harshly. This would avoid extra expense in the system and needless loss of liberty, especially if some deterrence would be preserved by some incarceration.

*Id.* at 1038, 1041, 1043 (footnotes omitted). Ms. James advances similar arguments under the retributivist theory:

Retributivists want criminals to suffer in proportion to their crimes, but some individuals may experience more suffering than others for the same punishment. The elderly may suffer more than younger people undergoing the same punishment because they are losing a greater percentage of their remaining years of life....

. . . .

A retributivist argument for lower sentences of the elderly can be made on the basis of age alone, rather than on the basis of a mental or physical condition associated with age. The retributivist premise that punishment should be proportionate to the offense has a particular application to elderly criminals. A long sentence is more harsh to an older person than a younger person, because it condemns the older person to spend a greater percentage of his or her remaining life in prison. This disparity could be reduced by giving the elderly sentences which represent the same *percentage* of their remaining lives as those given to younger persons.

For example, the average twenty-five year-old white male can expect to live for 46.9 more years. If such a person were convicted of a crime which carries a twenty year prison term, he would spend approximately forty-three percent of his remaining life behind bars. A sixty-five year-old is expected to live 14.2 more years. A twenty year sentence would thus represent 141% of this defendant's remaining life, a de facto life sentence. By contrast, forty-three percent of his life would be only 6.1 years. This scheme would have no effect on sentences of life imprisonment or death. Those sentences would have the same effect on a younger and an older person's remaining life.

. . . .

[Age neutrality] makes less sense from a retributivist point of view. Even though at first glance a theory which values punishment and suffering as an end in itself appears vengeful, an important element of retributivism is proportionality. Criminals should only suffer in proportion to their guilt and no more....

. . . .

... Assuming that those individuals toward the end of their lives feel a need to "get the most important things done 'while there is still time,'" the elderly suffer more for each year of imprisonment than their younger counterparts. This outcome is contrary to the retributivist proportionality mandate....

*Id.* at 1038, 1040, 1043, 1044 (footnotes omitted). It is her ultimate conclusion that:

[O]nce a sentence has been determined using utilitarian principles, the retributivist principle of proportionality should be considered to possibly modify the sentence term. Elderly prisoners should not be sentenced to what amounts to life sentences, if the legislature intended to impose a significantly lesser penalty for the specific crime committed.

*Id.* at 1044.

The trouble with all this stems from the premise that a penal sentence necessarily falls more heavily upon an older offender. This premise is an untested conclusion, unsupported by any psychological or sociological analysis. One might argue with equal persuasiveness that hefty prison sentences fall more harshly on younger offenders because they irretrievably extinguish opportunities for marriage, child bearing and rearing, establishing families, and launching careers, at least in the prime of life. *See Id.* at 1040 n. 154.

This Court therefore follows a general approach of age-neutrality in sentencing, focusing instead on the individually justified, proportionate "fit," *cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (discussing the importance of "fit" within the context of Federal Rule of Evidence 702 and the admissibility of expert testimony), between the crime committed and the sentence to be imposed on the particular individual defendant. Age plays little or no role in adjusting this fit unless the age of the offender plays some unique role in ascertaining the proper sentence. I have followed this procedure in the present case and find nothing particularly unique here.

## Decision point.

After the most careful review, this Court rules that the sentences imposed on each of these four defendant continue to be entirely justified and necessary to vindicate the important public policy concerns which undergird our criminal laws and ensure the domestic tranquility of our society. While this conclusion rests on the entire record, it is significant to this Court that each of these four defendants were and are knowing, intentional, and willful participants in the Patriarca criminal family of La Cosa Nostra, a quintessentially evil Mafia organization. Our society reserves its most severe punishments for those who pose its greatest dangers. Just as our democratic society rejects utterly any excuse for participation in terrorist or violent extremist organizations, so too it imposes its most severe judgments upon those who knowingly further the goals of a ruthless criminal organization which, by its very existence, seeks to pervert and manipulate the American justice system.

## Conclusion

For the foregoing reasons, each of the defendant's motions to reduce sentence is DENIED.