**AVCO CORPORATION, Plaintiff,**

v.

**PPG INDUSTRIES, INC., Defendant.**

**Civ. A. Nos. 90–10316–WGY, 90–10688–WGY.**

United States District Court, D. Massachusetts.

Nov. 9, 1994.

Peter B. Ellis, Foley, Hoag & Eliot, Boston, MA, Nicholas L. Coch, Shea & Gould, New York City, John E. Kidd, Rogers & Wells, New York City, for Avco Corp.

John M. Skenyon, Fish & Richardson, Boston, MA, Mark Levin, PPG Industries, Inc., Pittsburgh, for PPG Industries, Inc.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

## I. *The Trial*

### A. PROCEDURAL BACKGROUND

Avco Corporation ("Avco") brought the first of these two consolidated cases seeking a declaration that United States Patent No. 4,529,467 ("the Ward patent") issued to PPG Industries, Inc. ("PPG") was void or invalid on various grounds. PPG brought the second action alleging patent infringement by Avco and claimed a jury trial.

After consolidation, the issues triable as of right to a jury came on for such a trial. At trial, Avco admitted that its product, CHAR-TEK III, infringed certain claims of the Ward patent. The Court directed a verdict for Avco as to the remaining claims of the Ward patent. On the thirteenth day of trial, the remaining issues in the case were submitted to the jury which duly rendered a verdict on July 26, 1993, wholly in favor of

PPG. The jury found that Avco Corporation had failed to prove by clear and convincing evidence that the Ward patent was void or invalid on the ground that it was obvious or that it was anticipated by another Avco product, CHARTEK 59. It followed ineluctably that the Ward patent was valid and infringed by Avco's CHARTEK III. Indeed, the jury went on to find that Avco had, in fact, willfully infringed the Ward patent and, applying a lost profits analysis, awarded damages of $25,571,824.00. Despite the jury's finding of willfulness, this Court did not impose any multiplier of damages, nor did this Court impose any attorneys' fees. Given the size of the jury verdict and its obvious lost profits analysis, this Court was satisfied that PPG would be fully compensated by entering judgment on the jury verdict without a multiplier or attorneys' fees.

The Court then, *see Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959), turned to Avco's last ditch defense. Avco contended that the Ward patent was invalid and unenforceable due to the inequitable conduct of PPG in filing and pursuing its patent application.[1] On July 27, 1993, ruling from the bench, this Court rejected the inequitable conduct defense. In setting forth its oral findings and rulings, the Court reserved the right to enter a comprehensive written opinion. This is that opinion.

## B. FACTUAL BACKGROUND

To understand Avco's inequitable conduct defense, one must first understand the marketplace in which the patent at issue finds its commercial expression. The market is comprised of specialized fire protective coatings for large steel structures, primarily offshore drilling rigs and oil refineries. These coatings are designed to retard the buckling and actual consumption by fire of steel structural members for as long as possible when exposed to the extremely high temperatures of an oil fire.

Avco first dominated this market, having successfully developed, marketed, and supplied a product known as CHARTEK 59. CHARTEK 59 is customarily applied using galvanized mesh to support the fire protective coating. The galvanized mesh contains zinc. CHARTEK 59 is not patented, and was generally available on the market. Avco, however, did take some care to keep secret the actual composition of CHARTEK 59.

PPG made a considered corporate decision to enter this market. First, PPG reverse engineered CHARTEK 59. Mr. Ward, one of the inventors named in the Ward patent, prepared an in-house PPG version of CHARTEK 59. This initial composition contained no zinc. In July, 1980, PPG conducted a computer-based prior art search. The Sawko patent, a patent mentioning zinc as a fire-retardant substance, was ordered as a result of this computer search and was placed in Mr. Ward's personal files. The PPG laboratory also made frequent comparison and reference tests to the commercially competitive product it was imitating, CHARTEK 59. Throughout the testing, PPG referred to CHARTEK 59 as the control, the product against which PPG intended to measure its own commercial product. PPG called its prototype composition PITT–CHAR.

During the developmental work of PITT–CHAR at PPG, Mr. Ward, or someone acting on his behalf, contacted Dorothy MacFarlane at U.S. Borax and requested a fifty pound sample of FIREBRAKE ZB. Ms. MacFarlane specifically recalled this fifty pound request because most other requests for samples of FIREBRAKE ZB were in the one-half to two pound range. Accordingly, Ms. MacFarlane considered PPG to be a hot prospect for FIREBRAKE ZB. In filling its request, she also forwarded U.S. Borax bulletin 1281 to PPG.[2]

---

1. Avco argued strenuously that its inequitable conduct defense ought be presented to the jury along with the other issues so tried. This Court ruled that the defense was one properly presented to the Court under Federal Circuit precedent. *See infra* at II(B)(2).

2. Bulletin 1281 was available from U.S. Borax beginning in 1981 and was sent out to anyone who requested FIREBRAKE ZB. The bulletin describes the fire retardant qualities of FIREBRAKE ZB, a compound containing zinc.

For two years, culminating in September, 1983, Mr. Ward compared and tested PPG's PITT–CHAR precursor against CHARTEK 59 at Underwriters Laboratories ("UL Labs"). In September, 1983, one month prior to the Ward patent application filing date, Mr. Ward subjected CHARTEK 59 and PPG's PITT–CHAR to UL Lab's crucial 1709 rapid rise fire test. The results showed that PPG's PITT–CHAR product performed comparably to CHARTEK 59, with its standard galvanized, i.e. zinc-coated, mesh reinforcement. It was time to seek patent rights.

In submitting the application to the Patent Office on the PITT–CHAR product, Mr. Ward and the other inventors submitted internal PPG documents entitled Memorandum of Invention that referred to data which they considered prior art. Among the internal documents submitted were notes of telephone conversations between Mr. Ward and Linda Pignitore, a patent attorney at PPG.

Mr. Ward disclosed to Ms. Pignitore that CHARTEK 59 was an epoxy polyamide composition. He told Ms. Pignitore that CHARTEK 59 had been used as his base line and was a product he was trying to trump by the development of PITT–CHAR. In addition, Mr. Ward disclosed to Ms. Pignitore in his Memorandum of Invention certain tests from UL Labs which eventually became Example 9 of the Ward patent.

The notes reveal that Mr. Ward made mention of the commercial universe in which PITT–CHAR was intended to be marketed and the market against which PITT–CHAR was intended to be more effective. Mr. Ward mentioned the competition to be expected from cementitious products and mentioned to Ms. Pignitore the advantages and disadvantages of those products. Mr. Ward specifically mentioned CHARTEK 59 to Ms. Pignitore as a commercially viable PITT–

CHAR competitor. Mr. Ward thought that PITT–CHAR was patentable because it was a sufficient advance over this competition.

In July, 1984, the Patent Office rejected the Ward patent application as obvious. Even though the patent examiner presumably knew about the Sawko patent[3] which mentions the role of zinc in fire retardation, the primary references relied upon by the patent examiner as prior art epoxy intumescent fire retardant compositions were the Lloyd–Lucas and Matsumoto patents. Significantly, both these patents are devoid of any teaching that zinc is a source of the fire retardant capability of the patent issued.

To overcome the patent application rejection, Mr. Ward devised certain comparative tests to show that in fact it was the use of zinc that gave PPG's PITT–CHAR the unexpected superiority over the prior art. The comparison tests submitted by Mr. Ward in his affidavit were not the comparison tests already conducted between PITT–CHAR and CHARTEK 59 at UL Labs. Rather, the tests were comparisons created solely for the purposes of submission to the Patent Office. The control in these tests was not CHARTEK 59. Instead, the tests compared compositions of the supposed prior art referred to by the patent examiner with the PITT–CHAR of the Ward patent application. The tests demonstrated the marked advantage of the Ward patent application composition, i.e. PITT–CHAR. Thereafter, the Ward patent issued.

Based on these facts, Avco contends that the patent should be declared invalid due to inequitable conduct by PPG. Avco raises four grounds of alleged invalidity. First, Avco claims that the Sawko patent was material and intentionally withheld from the Patent Office. Second, Avco argues that U.S. Borax Bulletin 1281 was material information and was likewise intentionally withheld.

---

3. The Court reaches the conclusion that the patent examiner knew about the Sawko patent in the following fashion: The patent examiner lists, as part of his examination, the patent categories and subcategories searched. An actual search of these categories and subcategories would have revealed the Sawko patent. This Court adopts the presumption that the patent categories listed by the patent examiner are presumed to have been reviewed. Fed.R.Evid. 301. In the absence of any contrary evidence which would burst the bubble of the presumption under Federal Rule of Evidence 301, see Panduit Corp. v. All States Plastic Mfg. Co., Inc., 744 F.2d 1564, 1579 (Fed.Cir.1984), this Court, to give the presumption its proper effect, finds the patent examiner knew about the Sawko patent.

Third, Avco argues that the existence of CHARTEK 59 was material and intentionally withheld. Last, Avco claims that the UL Labs comparison tests between CHARTEK 59 and PITT–CHAR, the commercial application of the Ward patent, was material and intentionally withheld.

## C. DUTY TOWARDS THE PATENT OFFICE

■ The Supreme Court has held that attorneys, agents, and applicants "who have applications pending with the Patent [and Trademark] Office or who are parties to Patent [and Trademark] Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue." *Precision Instruments Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). *See also* 3 Ernest B. Lipscomb III, *Lipscomb's Walker on Patents* § 9:51, at 91 (3d ed. 1985). The Supreme Court imposed the duty to reveal in order to prevent the Patent Office from being classed among the "mute and helpless victims of deception and fraud." *Precision Instruments,* 324 U.S. at 818, 65 S.Ct. at 999 (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 [1944]). The highest level of honesty and candor on the part of applicants in reporting the material facts is essential in the patent system. *Norton v. Curtiss,* 433 F.2d 779, 794 (C.C.P.A.1970); *Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1538 (Fed.Cir.1984).

The duty of candor and good faith to the Patent and Trademark Office is embodied in 37 C.F.R. § 1.56(a) (1993).[4] So compelling is this duty that the Patent and Trademark Office devotes an entire chapter of the Manual of Patent Examining Procedure to it. Patent and Trademark Office, U.S. Dep't of Commerce, *Manual of Patent Examining Procedure* § 2001 (5th ed. 1983); 4 Ernest B. Lipscomb III, *Lipscomb's Walker on Patents* § 12:4, at 10 (3d ed. 1985).

■ This Court therefore construes the standard set forth in *Precision Instruments* and the Patent Office regulations as one of utmost candor, akin to that of a fiduciary duty.

In interpreting *Precision Instruments* and the regulations of the Patent Office, the Federal Circuit originally concluded that an objective test was intended with respect to the issue of mental state and that test was to be worked out in a case-by case basis. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1362–63 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed. Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Under the objective test, a patent rises or falls based upon what the patent applicant and its attorneys should have done or should have known. *Argus Chem. Corp. v. Fibre Glass–Evercoat Co., Inc.,* 759 F.2d 10, 14, 15 (Fed.Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985).

As time passed, the Federal Circuit criticized the too frequent resort to the inequitable conduct defense. *See, e.g., Burlington Indus. Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed.Cir.1988) (inequitable conduct defense appears in almost every patent case, is overplayed, and clutters the system); *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1454 (Fed.Cir.1984) (defense of

---

**4.** This section provides that a

'duty of candor and good faith' toward the Patent and Trademark office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of an application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1362 (Fed.Cir.1984), *cert. denied* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

37 C.F.R. § 1.56(a) (1993).

fraud on the Patent Office "fraught with confusion and contradiction"). *See also E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).

The Federal Circuit has been very active in the area of fraud, or as it prefers to call it, 'inequitable conduct,' that is alleged to have occurred during the prosecution of a patent application before the [Patent and Trademark Office]. A careful review of this activity leaves one with the distinct impression that the court will scrutinize charges of fraud very closely and will be disinclined to uphold an inequitable conduct defense in the absence of truly egregious conduct, such as falsification of data, or a clear showing of intent to deceive.

Robert L. Harmon, *Patents and the Federal Circuit* § 9.5(a), at 285 (2d ed. 1991) (citations omitted).

■■■ Indeed, in 1986, the Federal Circuit rejected the objective test, *see Akzo N.V. v. U.S. Intl. Trade Comm'n*, 808 F.2d 1471, 1481 (Fed.Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed.Cir.1989), and two years later, in *Kingsdown Medical Con-*

*sultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989) (en banc),[5] the Court stated that the conduct must be sufficient to require a finding of deceitful intent in light of all the circumstances.

## D. DETERMINING INEQUITABLE CONDUCT

This Court is, of course, obligated to follow the current case law in the Federal Circuit as that court explicates the standards set forth by the Supreme Court. The Court is concerned, however, with the indisputable fact that there is a tension between the standard as announced by the Federal Circuit and the duty of utmost candor set forth by the Supreme Court in *Precision Instruments*.[6]

As to each of the four items claimed to have been intentionally withheld, the Court must address four issues to determine whether there was inequitable conduct. First, were they material? Second, if they were material, were they intentionally withheld? Third, the Court must weigh the relative materiality and the relative culpability or egregiousness of the withholding. Fourth, the Court must add everything together to

---

**5.** The fact that the Supreme Court has denied certiorari on this issue is not to be construed as adoption of the views of a circuit court. *Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950).

**6.** The decisions in *Precision Instruments* and *Kingsdown Medical Consultants* are increasingly hard to reconcile in light of today's heightened emphasis on this aspect of the lawyer's fiduciary duty to the legal system itself.

Pursuant to the general revision of civil practice mandated by the Civil Justice Reform Act of 1990, *see* 28 U.S.C.A. § 471 (1993) and accompanying congressional notes, many district courts have adopted cost and delay reduction plans which emphasize the duty of an attorney as officer of the court. In many districts, a lawyer, as an officer of the court, has the high professional ethic of making voluntary disclosure of all documents "relevant to disputed facts alleged with particularity in the pleadings." Fed.R.Civ.P. 26(a)(1)(B). This requirement appears to impose an objective standard of conduct on the part of attorneys. What is more, this duty imposed on the lawyer by the rules of court is candidly at variance with the imperatives of the adversary

system. As seems to be the desire of the public, it calls the attorney to a higher standard of conduct—a standard of fidelity to the process, rather than simply a crabbed and cautious standard of disclosure designed solely to benefit the client in light of the admitted inadequacies of the process. In the civil justice system these inadequacies manifest themselves in overcrowded dockets, the lack of timely appointment of judges and the inadequate funding of core programs such as civil juries and defender services. It is in part to counter these inadequacies that ever higher standards are expected of practicing attorneys.

Similar inadequacies plague the patent system—inadequate funding of the Patent Office, the avalanche of patent applications before that office, the limited training of patent examiners to search through the extraordinarily high number of patents and prior art. Does it not seem proper that patent attorneys be held to the same broad duty of disclosure as is now the rule in civil litigation? In any event it is against this background that this Court must wrestle with the standard to be applied here with respect to inequitable conduct, particularly as respects the issue of intent.

see whether in conjunction there is clear and convincing evidence of inequitable conduct. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed.Cir.1987).

### 1. Materiality

█ In determining materiality, the test is whether there is a substantial likelihood that a reasonable examiner would consider the omitted reference important in deciding whether to allow the application and issue a patent. *American Hoist & Derrick*, 725 F.2d at 1362.

#### a. Sawko patent

█ The Sawko patent reference adds little or nothing to the issue of obviousness. A person of ordinary skill in the art, attempting to develop a long-term high performance epoxy intumescent coating for structural steel, would not be motivated to combine Sawko with any other prior art reference. Indeed, Sawko teaches away from the use of phosphorus, describing albator compositions for extremely short-term protection, and recommending zinc borate only in certain combinations, none of which are used in the Ward patent. In fact, Sawko does not teach the use of epoxy as a "resin," but only as an additive to a different resin. Sawko is less pertinent than the disclosure of zinc borate in the Ward patent, which reference PPG cited to the Patent Office. This Court presumes that the examiner considered Sawko, *see* footnote 3, *supra*, and found it less relevant than the references that he cited. *E.I. Du Pont de Nemours & Co. v. Berkley and Co., Inc.*, 620 F.2d 1247, 1266–67 (8th Cir.1980); *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1560 (Fed.Cir.), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986), *aff'g*, 641 F.Supp. 828, 867 (D.Mass. 1985). The Sawko reference is thus not material.

#### b. Bulletin 1281

█ Nor is Bulletin 1281 material. Bulletin 1281 did not deal with long term intumescent coatings for steel, but rather with short-term, quick ignition burning (as of fabrics) and the resulting char. The tests employed in the Bulletin are not the long-term (several hours) UL–263 and 1709 tests, but the very short-term UL 94 test (involving repeated applications of a Bunsen burner for 10 seconds at a time) and Oxygen Index Tests. Moreover, there is no teaching in the Bulletin concerning the importance of using phosphorous in the composition.

It is true that Bulletin 1281 found its way into the possession of PPG. Indeed, Bulletin 1281 was in Mr. Ward's own files. This court cannot, however, find by clear and convincing evidence that Mr. Ward or anyone else in authority ever looked at Bulletin 1281 or used it as an actual basis for analysis or invention.

#### c. CHARTEK 59

█ PPG entered the market to beat out CHARTEK 59 and reverse engineered CHARTEK 59 for the very purpose of developing and designing a better product. Moreover, CHARTEK 59 was the control for many tests run by PPG. There is a substantial likelihood that a reasonable examiner would have considered the existence of CHARTEK 59 material in deciding whether to issue a patent. This Court finds that the existence of CHARTEK 59 was material.

Since the existence of CHARTEK 59 was material information, what of PPG's duty to disclose? If this Court were the Platonic lawgiver, it would follow as matter of law that when a company successfully designs around an established product and applies for a patent, there would be a requirement that in order to meet the test of good faith and utmost candor, the commercial name of the established product should be disclosed in a prominent fashion to the Patent Office as prior art. It would follow, therefore, that the failure to make such prior art disclosure by commercial name of the product sought to be trumped by the patent applied for would constitute a failure of the duty of utmost candor.[7] Under the standard that this Court

---

7. The Patent Office might want to establish this obligation as an express requirement in its manual. It has not done so and, of course, this Court has nothing to say about that. Had the Patent Office followed this standard, it would be impossible for the Court to conclude that a duty of

submits that the Patent Office should adopt, the existence of CHARTEK 59 should have been disclosed as matter of law. This standard is not, however, presently the law.

■ As a predicate for establishing a duty to disclose, a party claiming inequitable conduct must first show that the patent applicants knew of the existence of the prior art and knew that it was material. *FMC Corp.,* 835 F.2d at 1415; *cf. American Hoist & Derrick,* 725 F.2d at 1362. While an applicant cannot "cultivate ignorance, or disregard numerous warnings that material information or prior art may exist" in order to avoid actual knowledge of the prior art, *FMC Corp. v. Hennessy Indus., Inc.,* 836 F.2d 521, 526 n. 6 (Fed.Cir.1987), there is no general duty that an applicant disclose "all pertinent prior art or other pertinent information of which he is aware." *American Hoist & Derrick,* 725 F.2d at 1362. An affidavit offering comparison test data, however, constitutes a representation to the Patent Office that the showing is a fair and accurate demonstration of the **closest** prior art of which the applicant is aware. *Norton v. Curtiss,* 433 F.2d 779, 794 (C.C.P.A.1970).

■ This duty to disclose the closest prior art in comparison tests is critical. Here, disclosures were made. PPG made some disclosures in the prior art section of its patent application. There were generic references to a class of products which included the product CHARTEK 59 within such generic description. Similarly, there are references to cementitious products in the background portion of the patent. Among the prior art references that were cited to the Patent Office is at least one reference which itself scientifically describes CHARTEK 59. This Court is not able to find by clear and convincing evidence that Mr. Ward and his colleagues at PPG recognized that there was some chemical reaction between the galvanized mesh and the composition of CHARTEK 59 which gave it its heightened fire protection properties. Mr. Ward recognized that CHARTEK 59 had heightened fire pro-

tection properties in comparison with then existing commercial alternatives. He also recognized its problems. CHARTEK 59 was difficult to use commercially since it was designed to be used with galvanized mesh and the time to erect the mesh had to be added to the application time for CHARTEK 59. Indeed, Mr. Ward thought that one of the outstanding commercial benefits of the PITT–CHAR product was the fact that it achieved its fire protection times without the necessity of mesh reinforcement.

In sum, Avco has not proved by clear and convincing evidence that Mr. Ward or his co-inventors recognized as a matter of fact that CHARTEK 59 was the closest prior art, even though this Court concludes that it was, in fact, the closest prior art.

### d. The control tests

■ The control or comparison tests between CHARTEK 59 and PITT–CHAR were neither disclosed, nor mentioned generally, nor were they referred to by PPG in any of it's patent application materials. All of those tests should have been disclosed, however, because they were all material. Even allowing for the fact that the PPG inventors never explored the chemical relationship between CHARTEK 59 and its galvanized mesh supports (and thus they did not perceive the role zinc played in CHARTEK 59's success), once the patent application had been rejected and the decision had been made to re-submit it (supported by the new, non-CHARTEK comparison tests), it must have become apparent to any fair-minded observer that PPG's earlier tests in developing PITT–CHAR—tests that used CHARTEK 59 as the control— were central to PPG's claim then being pressed on the Patent Office. These tests were thus material and should have been disclosed.

### 2. Intentional withholding? [8]

In light of the factual setting limned above, it is not difficult to discern what—more probably than not—happened here.

---

utmost good faith and candor had been met by PPG.

8. Since neither the Sawko patent nor Bulletin 1281 are material, there was no duty to disclose them and they do not figure in this part of the analysis.

PPG is a large corporation, functioning as a complex bureaucracy. A major strength of the bureaucratic model lies in its ability to integrate extraordinary specialization of function with clear lines of responsibility and authority. *See* Max Weber, *Bureaucracy*, in *From Max Weber: Essays in Sociology* 196–98 (H.H. Gerth & C. Wright Mills eds., 1946). The bureaucratic model poses special problems for in-house counsel, however, since the very essence of the lawyer's role is to serve as a teacher of the fact-law relationship and the primary expression of this teaching is to the client, *see United States v. Angiulo,* 852 F.Supp. 54, 57 (D.Mass.1994), in this case one's sole employer, the source of one's very livelihood. In such circumstances, it is vital that a corporation take steps to secure the independent judgment of its own legal staff and insure such internal quality control as will avoid suborning lawyers into becoming mere toadies. In this regard, PPG fails abysmally.

Remember, Dr. Ward and his colleagues did not recognize the contribution made to CHARTEK 59 from the galvanized wire mesh. They sought to develop a more fire retardant chemical composition without the need for any supporting mesh whatsoever. Once they hit upon a composition that performed markedly better than CHARTEK 59 in the UL Lab's crucial 1709 rapid rise fire test, they were ready to seek patent protection. Mr. Ward and his co-inventors thereafter acted ethically by disclosing CHARTEK 59 to Ms. Pignitore and revealing to her the commercial setting in which they were operating.

One can readily infer that Ms. Pignitore is familiar with the requirements of the Patent Office and the decisions of the Federal Circuit. Doubtless she recognized that she was not required to explain the competitive setting and PPG's commercial goals to a patent examiner, but that a mere generic reference to CHARTEK 59 would suffice. *Andrew Corp. v. Gabriel Elecs., Inc.,* 847 F.2d 819, 823–24 (Fed.Cir.), *cert. denied* 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988) (affirming district court's finding that a prior art horn antenna that was in the patent's applicant's possession was "disclosed generically in the patent application" and that there was no intent to withhold this information); *Vandenberg v. Dairy Equip. Co.,* 740 F.2d 1560, 1568 (Fed.Cir.1984) (generic disclosure in the patent application of patent applicant's own prior art device held "inconsistent with intent to perpetrate fraud" on the Patent Office). In this she appears to be correct. She, and therefore PPG, originally intended to tell the Patent Office just as little as legally permissible about CHARTEK 59, the product which at that time dominated the market PPG sought to capture. Though sailing close to the wind, she satisfied the minimum requirements for disclosure as matter of law.

But all for naught, as the patent examiner rejected the original application as obvious. Now all is consternation. Dr. Ward and his colleagues reasonably devise a series of comparison tests to demonstrate the advantages of PITT–CHAR over the sources cited by the patent examiner. This, of course, places a fearful dilemma in Ms. Pignatore's lap. She knows and appreciates that submission of comparison tests to the Patent Office implicates the duty to compare the **closest** prior art. *In re Johnson,* 747 F.2d 1456, 1461 (Fed.Cir.1984); *Norton v. Curtiss,* 433 F.2d 779, 794 (C.C.P.A.1970). She **also** knows and appreciates that CHARTEK 59 is the product to beat and that PPG has run numerous comparison tests between it and PITT–CHAR. Yet she does nothing. Fancying herself an "advocate" for PPG, she allows the supplemental application to be submitted without any mention whatever of the CHARTEK 59—PITT–CHAR comparison tests, lamely seeking to justify her conduct with the bureaucratic excuse that she herself did not appreciate the true relevance of the CHARTEK 59 prior art. While this is true, it is a sorry excuse indeed from an attorney charged with "candor and good faith." 37 C.F.R. § 1.56(a) (1993).

By a fair preponderance of the evidence, this Court infers that PPG fostered an environment that allowed deception in the manner in which it sought commercially valuable patents. It did so in the manner in which it divided duties as between inventors and patent attorneys, and in having but minimal quality control over the conduct of its attor-

94

neys, a lapse which created an environment that led to the disclosure of only such information as was necessary to get a patent. The fault is that of corporate bureaucracy and PPG management for failing adequately to recognize their duties and supervise their subordinates.

By a fair preponderance of the evidence, it can fairly be inferred that PPG as a corporate citizen intended to deceive the United States Patent Office by its failure to mention the comparison tests between CHARTEK 59 and PITT–CHAR. CHARTEK 59 was the product that PITT–CHAR was designed around, the product that PPG reverse engineered, and the product that it sought to trump in the marketplace. PPG through its directors, especially its outside directors, should examine its internal processes and reflect on whether, as a good corporate citizen, it has adequately discharged its duty to its shareholders and society as a whole. More importantly, PPG should examine whether it has discharged its duty to the United States Patent Office, an office underfunded, straining fairly to draw that complex line which will ensure invention and progress and at the same time not improperly, not excessively, confer the legal monopoly of a patent.

 The test set forth by the Federal Circuit is not, however, proof by a fair preponderance of the evidence. On the issue of intent, this Court is bound by precedent in the Federal Circuit to hold Avco to a burden of proof by clear and convincing evidence that there was an actual intent to deceive the Patent Office by the conduct involved herein. *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 939 (Fed.Cir.), *cert. denied* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990); *Kingsdown,* 863 F.2d at 872. This Court interprets the decisions of the Federal Circuit as holding that in the absence of clear and convincing evidence of elements equivalent to common law fraud, an intent to deceive cannot be inferred. *Northern Telecom,* 908 F.2d at 939. There is no such clear and convincing evidence here, no clear and convincing evidence that Ms. Pignatore's intentional omission of the CHARTEK—PITT–CHAR comparison tests was the knowing

omission of material evidence intended affirmatively to mislead the Patent Office. In light of the requirement of proof by clear and convincing evidence, therefore—and solely because of this requirement of a heightened standard of proof—this Court is unable to find that "in light of all the evidence.... [the] conduct in its totality manifests a sufficiently culpable state of mind to warrant a determination that it was inequitable." *Consolidated Aluminum Corp. v. Foseco Int'l. Ltd.,* 910 F.2d 804, 809 (Fed.Cir.1990).

Accordingly, Avco's inequitable conduct defense fails and, since the Ward Patent is valid and infringed, judgment properly entered upon the jury verdict.

II. *Post–Trial Issues*

A. **MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT**

Avco promptly moved pursuant to Fed. R.Civ.P. 50 for judgment notwithstanding the verdict on the ground that the evidence was insufficient as matter of law to support a lost profits analysis. After an exhaustive review of the entire record, this Court concludes that the evidence was more than sufficient to warrant the jury's verdict. The motion for judgment notwithstanding the verdict is DENIED.

B. **MOTION FOR A NEW TRIAL**

Avco also moved for a new trial pursuant to Fed.R.Civ.P. 59, raising a host of issues. Two are worthy of comment.

1. **A volunteer jury?**

 Avco complains that the Court empanelled a volunteer jury in violation of its right to be tried before a jury selected at random.

There was no volunteer jury here. The jury venire in this case was summoned to court and sent from the jury pool to the courtroom in precisely the same fashion as any other jury in this District. Avco recognizes these facts and makes no challenge thereto.

It happens, however, that the jury selected for the trial of this case was empanelled at a time when the fiscal year 1993 appropriation

of funds for the fees of jurors had been so depleted that the Executive Committee of the United States Judicial Conference had restricted the further expenditure of such funds only to jurors empanelled in criminal cases. While a supplemental appropriation was then pending before Congress, no final action had—on the date of empanellment—been taken. In short, there was at that time no money to pay the jurors.

The Court thus decided upon a policy of excusing those jurors who, due to the uncertainty of payment of juror fees, felt they could not remain for the trial. Accordingly, the following colloquy with the jury took place.

THE COURT: I've got something very serious to talk with you about now, and that's how I mean to say it, to talk with you.

This case is over three years old. These people, and corporations, of course, are people, they're companies but they're people, they have, people work there, they have stockholders. The only way this dispute can be resolved is if a jury resolves it. That's the Constitution of the United States. And these people have waited for over three years, three years to have their case tried. And it is my duty to tell you that on the 12th of June the court system of the United States ran out of money to pay civil jurors.

Now, that doesn't mean there won't be money. I can tell you exactly where things stand. The House of Representatives has passed a supplemental appropriation and that money, along with money for Somalia and some other things, has money to pay civil jurors. The Senate, last Tuesday, passed a supplemental appropriation and that bill, along with some other things, has money to pay civil jurors. The two bills do not mesh. So those of you who are students of government know that what happens now is that the bill that has the money for civil jurors goes to a conference committee. If the conference committee approves the legislation, it will then go to the President of the United States [9] and

we will see if the President signs it, and I have no indication that he will not. I don't mean to give the implication I talk to him on a regular basis, but I haven't heard that he will not.

I share all this with you because, you see, though the law says that jurors are entitled to their pay, not much, I agree, but some pay day by day, including your parking fees and the like, Article I of the Constitution of the United States says Congress shall appropriate the money to run the government. As I stand before you, Congress has not appropriated the money to pay for the constitutional rights that is the right of these litigants. So what to do?

If Congress appropriates the money you'll all get paid. As soon as it's appropriated we'll cut the checks and you'll be paid. But I cannot promise you Congress will appropriate the money. Indeed, I cannot, though I am a federal judge, obligate the government of the United States to pay the money. And I am very serious here, it would be a crime, and I would commit it, if I promised you that they will appropriate the money. All I can tell you is what I know. That each house in separate legislation has appropriated the money and that it's going to conference to see if they will appropriate it and we expect the President to sign it.

This is the second time since I have been a federal judge that the Congress of the United States has failed to appropriate enough money to pay for the direct democracy which, of course, is the essence of the jury system. I suppose I could wait until the money was appropriated. Because I can tell you I expect it to be appropriated and we are doing everything we can to urge its appropriation. It costs the taxpayers $16,000 a day to run this courtroom. And this is a case that's ready for trial.

Now, I'll be very honest. They're still paying me. They're still paying Ms. Smith. These are interns, they don't get paid. They're paying Mr. Womack be-

9. The Court recognizes the inaccuracy here in that I omitted to explain the crucial step of final

enactment by each house of Congress. Nothing turns on the point.

cause the funds are there. I feel very much—it you've ever read the story, or even seen the movie, it's said that when, in the Alamo, they really realized that no help was coming, that they had played out the string, Colonel Travis went and he drew with his sword in the sand and he said, "Anyone who wants to leave is free to leave. No ignominy will attach to you. No, no one will question if you now walk out. I cannot require that you stay." [10]

So I put it to you. This case is here to be tried. It will take 13 days to try. [11] Once I start, we're going on on each of the days I said until we're done, so that justice will keep being given in this courtroom by the people. If we cannot put a jury together here today, I will shut down. I'll try the criminal cases I have and the next one I have due is the one on the 19th.

So if you can stay, you will be paid if Congress appropriates the money when they appropriate the money. But if you choose to leave, you are now free to go. And since I need to know who to pick from, feel free to go if you choose to leave.

You're excused, sir.

A JUROR: Do we need a good reason?

THE COURT: Absolutely not. It's—I want to exercise no pressure on you. I've asked all the questions. If I had the money to carry out the law, the Congressional mandate, I would do just as I did on the other case. I would say this jury is indifferent. In other words, this is the group from which we can pick a fair jury. But I can't hold you here if you want to leave, and I, I don't want to put any pressure on anyone.

So anyone who needs to leave, leave now, but give your name because we're going to have to know who we've got left.

(Pause.)

A JUROR: May I ask a question?

THE COURT: Of course you may, ma'am.

A JUROR: Okay. Assuming that they do appropriate money even if it is 25, 30 days later.

THE COURT: You'll be paid for every day of service and any expenses under the law that the—the check, it's like the check will be in the mail. You'll get paid. I just can't, I just cannot, I would violate the law to—I cannot promise you that they'll ever pass it. I think they will. But I don't know. If you stay the likelihood is you'll be paid sometime in the future. I cannot promise you you will be paid. I think we pay at the end of every week otherwise.

Yes, ma'am?

A JUROR: I was just wondering if it was possible if we could be paid transportation and maybe not—

THE COURT: I haven't—

A JUROR: You don't know?

THE COURT: Oh, I know very well. I know that there is no money in the account, I know that I am the responsible officer, and I know that I would violate criminal law if I promised to pay you any money. I cannot do it. All I can say is that as soon as we get the money, if we do, you'll be paid.

Yes, ma'am?

A JUROR: Are you going to one o'clock?

THE COURT: One o'clock—guarantee, 9:00 to 1:00 every day. We'll never keep you later than 1:00 until we get to the 22nd, the day the case comes to you, and then we will expect you to stay into the afternoon to deliberate and for whatever days succeeding.

Yes, sir?

A JUROR: Will we get a receipt for all the days we're here?

---

10. For the film treatment of this incident, *see* **The Last Command** (1955). *Compare* **The Alamo** (1959) and **Thirteen Days to Glory** (1986). The incident is, however, almost certainly apocryphal. Albert A. Nofi, *The Alamo and the Texas War for Independence* 114–15 (1992).

11. The Court was able to be very explicit about the length of this civil trial since, under this District's Cost and Delay Reduction Plan, the imposition of time limits is encouraged. Expense and Delay Reduction Plan Rule 5.03. In this case, after discussion with the parties, a 13–day trial was planned in the final pre-trial order.

THE COURT: Yes, sir, we will keep all the records. We'll keep names, we'll keep the records in the normal course. And, you're not volunteering the time, but on the other hand, I can't promise payment. But we'll keep the records the way we normally do and anyone who serves, if they appropriate the money, will be paid.

Thirteen jurors then left the courtroom, deemed excused by the Court. Fifteen jurors remained. Avco duly objected to this procedure at the side bar. The Court thanked the jurors who remained:

THE COURT: Ladies and gentlemen, there are in the whole United States 654 United States District Judges. This is one district judge who wants to say to you very personally how deeply I am honored by your participation in this process. If anyone ever wonders what patriotism is, and we use that word too loosely in society today, they have only to look around the quiet of this courtroom where the government has failed the people but the people have seen to it that justice can go on.

I find this panel indifferent. Proceed, Madam Clerk.

The jury was then empanelled and the trial commenced.

Avco contends that the procedure followed by the Court disturbed the requirement that juries be chosen at random and impermissibly skewed the venire such that it was composed only of people with a heightened sense of civic responsibility. This, Avco contends, prejudiced it, since its defense depended on proof that the United States Patent Office mistakenly issued the Ward patent. Avco infers that those jurors who would tend to be most skeptical of government agencies are those who would also take their civic responsibilities more casually and would more likely seize the chance to be excused from jury duty. Thus, Avco concludes it was left with a jury of authoritarian personalities predisposed to uphold the decisions of the Patent Office to an infringer's detriment.

This entire argument is nothing more than rank speculation. One could argue with equal plausibility that the jury would be hostile to the Patent Office as an appendage of a government so crippled by gridlock as unable timely so to organize itself to pay the jury fees mandated by statute. 28 U.S.C.A. § 1871 (1994). Both suppositions are wholly lacking support in the record.

■ Although federal jurors have been compensated for their service since 1791, judges have always possessed the discretion to excuse jurors in appropriate circumstances. *See* Report of the Judicial Conference Committee on the Operation of the Jury System, "The Jury System in the Federal Courts," *reprinted at* 26 F.R.D. 409, 488–91 (1960) (detailing history of payment of federal jurors and noting that jury service "must be considered as a patriotic duty ... with a common understanding that the per diem cannot be considered as more than token compensation for the time given"); Act of March 3, 1791, 1 Stat. 217 (establishing per diem of 50 cents). These circumstances include financial hardship and other personal difficulties attendant upon jury service. Proper exercise of that discretion has never been held to impair the requirement of a random selection of jurors. Here, these jurors were summoned to court in an entirely random fashion strictly in accordance with 28 U.S.C.A. §§ 1861–63 and the jury plan for this district. The only change from standard practice was the liberal excuse afforded jurors who could not remain in light of the Court's inability to guarantee payment of the jury fee. Exhaustion of the jury fee appropriation necessarily frustrates the statutory mandate of 28 U.S.C.A. § 1871 and warrants excusing jurors desiring to rely on the promise of the law that they will be paid for their service. It does not and cannot follow, however, that exhaustion of the jury fee appropriation can suspend, even temporarily, the Seventh Amendment's constitutional guarantee of a jury trial in civil cases. Simply put, the Bill of Rights operates wholly independent of the appropriations process. Under the Fifth Amendment, municipalities are not relieved of the requirement to pay "just compensation" for takings due to inadequate funding; under the Sixth Amendment, the right to counsel does not turn on appropriated funding; and under the Seventh Amendment, the judiciary cannot close the courthouse doors to civil litigants simply because

appropriated funds run out. Any such acquiescence on the part of the judiciary—even a temporary acquiescence upon assurance of supplemental appropriation—would vitiate the constitutional doctrine of separation of powers and establish the dangerous precedent that the discharge of the judicial power of the United States in upholding the Bill of Rights must wait upon action by the Congress and the President. That is not our constitutional form of government.

In the circumstances of this case, a liberalized excuse policy was well warranted, occasioned no demonstrable prejudice to Avco, and constitutes no error.

## 2. Extent of the right to a jury trial

■ "The defense of inequitable conduct in a patent suit, being entirely equitable in nature, is not an issue for a jury to decide." *Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993) (per curiam) citing *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Transmatic, Inc. v. Gulton Indus., Inc.*, 835 F.Supp. 1026, 1031 (E.D.Mich.1993). Despite the Federal Circuit's explicit holding, Avco argues that its prima facie showing of commonality between the factual issues underlying the invalidity claim and the inequitable conduct claim entitle it to a jury trial as to inequitable conduct.

■ Even if Avco had made a prima facie showing of commonality, a point the Court does not decide,[12] the Court's decision was proper. Where factual issues overlap between legal and equitable claims, what is crucial is the order in which the matters are resolved. *See Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed.Cir. 1987) (considering commonality issue where the Court held the trial on inequitable conduct before the patent infringement trial). The jury should decide legal claims before the Court rules on the equitable claims. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469,

479, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510–11, 79 S.Ct. 948, 957, 3 L.Ed.2d 988 (1959) ("only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims"). Here, the Court did not rule on the inequitable conduct claim until the jury decided the invalidity issue. In light of this, there is no basis for attempting to carve out an exception to the Federal Circuit's clear mandate in *Paragon.*

Avco's motion for a new trial is DENIED.

## 3. Supplementary damages

■ At the conclusion of the jury-waived portion of the trial, the Court entered its findings and rulings from the bench, concluded that the inequitable conduct defense failed, and thus upheld the jury verdict. At the same hearing, the Court permanently enjoined Avco from further infringement. At Avco's insistence, however, in view of the public safety concerns inherent in the prompt provision of these fire retardant coatings to projects already in progress, the Court allowed Avco to perform such contractual obligations as were then extant.

Such an injunction, of course, necessarily contemplates some limited further infringement on Avco's part. PPG promptly moved for supplementary monetary damages for this infringement. Avco countered, claiming a right to a jury trial on such damages. The Court rejected this claim, reasoning that Avco's request that it be allowed to fulfill its then extant contracts necessarily constituted an admission that the Court might calculate the monetary damages flowing from anything less than an immediate, blanket injunction.

The parties next fell to sparring over the nature and extent of the record upon which the Court was to measure the supplementary damages. While Avco cooperated in the production of the financial data necessary to

---

12. The fact that some of the same evidence is relevant to both the legal and equitable claims is not enough to establish "commonality." "The argument that the same art submitted as material in a [patent infringement trial] may be presented in a trial of [an equitable claim] is without merit,

for there is a fundamental difference between *evidence* and *issues.*" *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed.Cir.1987) (emphasis in original) (no showing of commonality).

calculate the extent of its permitted post-injunction sales of CHARTEK III, it continued to press for a further, full-blown evidentiary hearing prior to any finding by the Court as to PPG's lost profits from these sales. PPG, however, obviated the need for any possible further evidentiary hearing by limiting its request for supplementary damages to the 15% royalty on the Avco sales which its trial experts had testified was reasonable. This made eminent sense and the parties thus fashioned their positions on the undisputed amount of Avco's permitted post injunction sales of CHARTEK III and the hotly-disputed issue of the reasonable royalty thereon—issues already fully developed in the trial record before judge and jury.

Paralleling these developments, PPG sought to have Avco held in contempt when it brought yet another competitive fire retardant coating to market. PPG abandoned this petition, however, when its own chemical testing revealed the absence of zinc in the new Avco formula.

In calculating a reasonable royalty, the Court follows the criteria set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970), *modified*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). The Court has considered the fifteen factors relevant to a determination of a reasonable royalty.[13] Application of the 15–part *Georgia–Pacific* test indicates that a royalty of three

percent is appropriate here. *Compare Pall Corp. v. Micron Separations, Inc.*, 792 F.Supp. 1298, 1330–31 (D.Mass.1992) (appeal pending).

The Court substantially discounts the 15% royalty sought by PPG based upon its independent assessment of the trial record and the likelihood that Avco, as the industry leader, would relatively promptly bring out a competitive, non-infringing product. This likelihood would, of course, adversely affect the profitability of the product made under the Ward patent and the utility and advantages of the patented property over the non-infringing product which could be used for working out similar results.

Accordingly, the Court assesses supplementary damages of $284,192.79 plus prejudgment interest thereon based upon the three month U.S. Treasury bill for the secondary market. The parties shall promptly prepare a form of judgment.

---

**13.** As stated by the Court in *Georgia–Pacific,* those factors are as follows:

The royalties received by the patentee for the licensing of the patent in suit ...[,] [t]he rates paid by the licensee for the use of other patents comparable to the patent in suit[,] [t]he nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold[,] [t]he licensor's established policy and marketing program to maintain his patent monopoly ...[,] [t]he commercial relationship between the licensor and licensee ...[,] [t]he effect of selling the patented specialty in promoting sales of other products of the licensee ...[,] [t]he duration of the patent and the term of the license[,] [t]he established profitability of the product made under the patent; its commercial success; and its current popularity[,] [t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results[,] [t]he nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention[,] [t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use[,] [t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions[,] [t]he portion of the realizable profit that should be credited to the invention ...[,] [t]he opinion testimony of qualified experts[,] [t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement[.] 318 F.Supp. at 1120.